1

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

2

———————————————————————

3    United States of America,        ) Criminal Action
                                      ) No. 1:22-cr-00096-CKK-5
4                      Plaintiff,     )
                                      ) **Sentencing**
5    vs.                              )
                                      )
6    Jean Marshall,                   ) Washington, D.C.
                                      ) **May 15, 2024**
7                      Defendant.     ) Time:  1:30 p.m.

8    ———————————————————————

                    Transcript of **Sentencing**
9                        Held Before
             The Honorable Colleen Kollar-Kotelly
10            United States Senior District Judge

11

                    A P P E A R A N C E S
12

     For the Government:       **Rebecca G. Ross**
13                             UNITED STATES ATTORNEY'S OFFICE
                               FOR THE DISTRICT OF COLUMBIA
14                             601 D Street, Northwest
                               Washington, D.C. 20579
15
                               **Sanjay H. Patel**
16                             UNITED STATES DEPARTMENT OF JUSTICE
                               950 Pennsylvania Avenue, Northwest
17                             Washington, D.C. 20004

18    For the Defendant:       **John L. Machado**
                               LAW OFFICE OF JOHN MACHADO
19                             503 D Street, Northwest
                               Washington, D.C. 20001
20
      Also Present:            Hana Field, U.S. Probation Officer
21    ————————————————————————————————————————————————

22    Stenographic Official Court Reporter:
                               Nancy J. Meyer
23                             Registered Diplomate Reporter
                               Certified Realtime Reporter
24                             333 Constitution Avenue, Northwest
                               Washington, D.C. 20001

25

<u>P R O C E E D I N G S</u>

1    THE COURTROOM DEPUTY:  Criminal Case 22-096-5, the
United States v. Jean Marshall.

Counsel, would you please identify yourself for the
record.

MS. ROSS:  Good afternoon, Your Honor.  Rebecca
Ross and Sanjay Patel on behalf of the United States.  We're
joined at counsel table by Special Agent Michael Biscardi
and paralegal Henry Fronk.

THE COURT:  Good afternoon.

MR. MACHADO:  Good afternoon, Your Honor.  John
Machado on behalf of Ms. Jean Marshall, who is present.

THE COURT:  Good afternoon, Mr. Machado and
Ms. Marshall.

THE DEFENDANT:  Good afternoon.

THE COURT:  All right.  We're ready to proceed
with the sentencing.

The jury rendered guilty verdicts of Count 1,
conspiracy against rights, statutory maximum is 10 years in
jail and a maximum fine of $250,000.  Count 2 is Freedom of
Access to Client Entrances Act, maximum penalty is one year
in jail, maximum fine is 100,000.  The jury also made a
special finding that force was used, as well as physical
obstruction.

I have a presentence report, the government's

1    sentencing memoranda, the defendant's memorandum in aid of

2    sentencing, and a victim impact statement.  In terms of

3    objections, I've resolved all the objections to the

4    guideline calculations that were in the presentence report

5    that they were -- that parties were objecting to.

6          I relied predominantly on the facts set out in my

7    omnibus memorandum opinion dated November 16th, 2023, for

8    recitation of the facts that I used in ruling on the

9    objections to the guidelines.  The omnibus opinion was based

10    on a ruling on various post-trial motions.  I used that one

11    because it -- I had at that point the transcripts, the

12    videos, and the exhibits.  So I would have all of the

13    evidence.

14          I've made distinctions between -- although it was two

15    trials, I've made distinctions in terms of what evidence was

16    presented in the trials as they relate to the defendant.  It

17    does give additional information about actions of

18    co-conspirators, but it is related to the evidence that was

19    presented.

20          So I do not expect to hear from either counsel about

21    the objections.  I've already ruled on it.  You filed

22    pleadings, which is why I had you do it in writing.  I've

23    issued an opinion in writing.  So your objections,

24    et cetera, are -- you know, have been preserved, and you can

25    certainly take them on appeal, should you appeal.

1          In terms of the advisory sentencing guidelines for
2    Count 1, conspiracy against rights, the offense level -- the
3    base offense is 12.  Physical restraint involving Ms. Holler
4    as 2.  Vulnerable victim, Ms. Holler, is 2.  Obstruction of
5    justice, which relates to the lack of veracity in terms of
6    the testimony, which is an additional 2.  So the total
7    offense level is 18.
8          On Count 2, which is the FACE charge, the base is 12.
9    Vulnerable is Ms. Jones, additional 2 points.  Again,
10   obstruction of justice relating to the testimony is an
11   additional 2 points.  Comes to 16.
12         You choose the higher level, which is 18, add
13   2 points for the units, and it comes to a total offense
14   level of 20.
15         Criminal history, there are no criminal history
16   points.  So the advisory sentencing guidelines are custody
17   on Count 1, 33 to 41 months; on Count 2, 12 months.
18         Supervised release, Count 1, 1 to 3 years; Count 2 is
19   1 year.
20         Probation, ineligible on Count 1; 5 years on Count 2.
21         The fine range on Count 1 is 15,000 to 150,000; Count
22   2 is 15,000 to $100,000.
23         Restitution is not at issue.
24         The special assessment on Count 1 is 100.  The
25   special assessment on Count 2 is 25.

1           The -- for those parts of the presentence report that

2     are undisputed, my findings of fact are pursuant to Federal

3     Rule of Criminal Procedure 32(i)(3)(A).  For those that are

4     disputed, my findings of fact are based on Federal Rule of

5     Criminal Procedure 32(i)(3)(B).  I'll adopt the presentence

6     report as written.

7           I can now hear from the government, defense counsel,

8     and the defendant, if she chooses to address the Court.  I

9     would only indicate if she does that we should discuss a

10    time frame for it.  I didn't do that in some of my other

11    cases, and I'm -- I do have another sentencing so I can't

12    spend the whole afternoon on this.

13          Proceed.

14          MS. ROSS:  Thank you, Your Honor.

15          First, the government wants to note that this case is

16    not about the defendant's personal beliefs.  It is about her

17    role in violating the civil rights of people she did not

18    know.  It is about her role in crossing the line from

19    peaceful protest into the violent obstruction of

20    reproductive health care.  And to be clear, the defendant's

21    actions that day were violent, as you saw, when she pushed

22    and shoved the clinic workers and pushed victim Shampy

23    Holler to the ground while she was in pain.

24          For the defendant's role in this violent obstruction,

25    as the government has briefed extensively, the government is

1    asking this Court to sentence the defendant to a term of

2    incarceration at the high end of her sentencing guidelines,

3    which is 33 to 41 months.

4         As this Court is very familiar with the evidence in

5    this case and the government has extensively briefed the

6    defendant's role in this clinic invasion, I will keep this

7    brief, but there are a few points I want to highlight.

8         Marshall's sentencing memorandum, like all of her

9    co-defendants, distorts reality and shirks responsibility,

10   and this is not the first time she's done that in this case.

11   She sat over there and while under oath obstructed justice;

12   distorting the facts, misrepresenting her role, and

13   downplaying the significance of her actions.  It is clear

14   that the defendant is unwilling to accept the gravity of her

15   actions that day.

16        The clinic invasion is an example of the defendant's

17   escalating behavior, her willingness to cross the line and

18   break the law, to deviate from peaceful protest into

19   violence.  As Your Honor saw on the surveillance video and

20   heard the testimony of the victims that day, the defendant

21   was willing to push and shove clinic staff and shove

22   Ms. Holler down to the ground even while she was

23   experiencing a medical emergency.  And she did so to force

24   her own personal beliefs onto others.

25        The defendant's actions that day traumatized the

1      victims.  She showed no empathy and no compassion for those

2      in need.  Her role that day cannot be minimized away no

3      matter how hard the defendant tries.  These are serious

4      offenses.  They're not about the defendant's beliefs.  The

5      defendant has shown that she's unwilling to accept

6      responsibility for her role that day and the violence she

7      inflicted.

8            And for her actions that day, in consideration with

9      the section 3553(a) factors, a sentence at the high end of

10     her guidelines is appropriate.

11           Thank you, Your Honor.

12                THE COURT:  All right.  Mr. Machado.

13                MR. MACHADO:  Thank you, Your Honor.

14           Your Honor, it is regretful what happened that day.

15     We don't -- it's a situation that perhaps was one that was

16     not under control but, with regard to Ms. Marshall, she was

17     at the location.  But what the government has chosen to do,

18     respectfully, is that I think that they have exaggerated and

19     put a certain spin on certain things that Ms. Marshall did.

20           And what I -- and they have taken things that we have

21     seen in videos and made their own conclusions, when I think

22     a more logical conclusion is something a little different,

23     something a little more empathic or compassionate, to -- to

24     paraphrase the government.

25           So, I mean, she did -- she did come with her sister,

1    Paulette Harlow from Boston, and she mostly was going to

2    accompany her sister and to -- to, basically, be along with

3    her as a sister more than an actual participation in this.

4    As the Court recalls, there was a discussion about the fact

5    with -- through witness Caroline Davis that there was some

6    people in this organizational meeting that arrived late and

7    some older women.  And that is consistent with what happened

8    with Ms. Marshall.  They arrived rather late so they weren't

9    part of the -- to the extent, we'll put in quotes, it was

10    organized.  In fact, it was a little bit -- a little bit

11    chaotic, frankly.

12          And so that's -- and as the Court also heard from, I

13    believe it was, Ms. Davis, everyone just kind of chose their

14    role.  And the role that Ms. Marshall chose is one that was

15    one to kind of fashion, you know, with the Red Rose rescues

16    that we heard about discussed.  You see in the videos that

17    she was trying to give Ms. Ashley Jones a pamphlet and

18    trying to talk to her.  And -- and she was trying to

19    interact with her when the police officers arrived.  The

20    Court saw that the police officer told her to move away or

21    to get out of the way, and she did it immediately.

22          So her role was -- and I will point out also -- and

23    as far as the entry, she was towards the back.  She was not

24    part of the first group that went there, although

25    Ms. Marshall wants me to make clear the fact that she's not

1    suggesting that any of the people pushed or forced

2    themselves in.  But what I am trying to establish is the

3    fact that she was towards the back of that.  And she was, in

4    fact, at one point pushed into a chair, if the Court

5    recalls, by one of the -- by one of the workers.

6          So I think we need to address, I think -- which I

7    think the Court would be rightly concerned about the

8    interaction with Ms. Shampy Holler.  Now, I made -- I

9    respect the Court's decision as far as the -- the plus 2 for

10   the physical restraint.  But I would suggest to the Court

11   that what you saw and what is more logical is not a

12   situation whereby Ms. Marshall was trying to restrain or

13   keep Ms. Shampy Holler down.

14         The Court recalls, Ms. Holler went down to the ground

15   on her own, and another individual, another -- another

16   person who was there as part of the group, went and got

17   Ms. Davis -- or Ms. Marshall because she was a medically

18   trained nurse.  She's been a nurse for many years.  She's

19   retired now, has been -- her life has been committed to

20   helping people.

21         And what you saw was my client getting down on the

22   ground and apparently talking to her, actually holding her

23   hand to try and interact with her.  Now, what the government

24   has indicated -- and they argued it at trial, and the Court

25   has made its ruling on it -- is the fact that Ms. Marshall

1    put her hand on the shoulder of Ms. Holler.  At least that's

2    what the video shows.  I would suggest to the Court that

3    that was not a situation of trying to restrain her or push

4    her down.  It was either a situation of the fact that it was

5    not in her best -- best benefit to getting up or it was and,

6    as it more appeared, that Ms. Marshall --

7            THE COURT:  Do you have any testimony to that

8    effect besides you're indicating that that's what you think?

9    I have to say, looking at the video, it looked to me as if

10    she was not gently, you know, indicating to her that -- I

11    mean, if you're supposedly trying to help her, you would

12    gently try to make sure that she stays there.  That's not a

13    gentle --

14            MR. MACHADO:  Well, she was holding her hand as

15    far as gentleness, but --

16            THE COURT:  No.  I'm talking about the push, which

17    you have indicated is somehow -- some concern about her not

18    trying to get up.

19            MR. MACHADO:  Well --

20            THE COURT:  And I'm saying to you that looking at

21    the video, it does not look like a gentle, you know, "stay

22    where you kind of thing."  It looked like a push.  So I'm

23    asking, is there any testimony in the trial that indicated

24    that what she was doing was trying to gently leave her on

25    the ground as opposed to a push?

```
1              MR. MACHADO:  Respectfully, Your Honor, I don't
2    think there was a push.  I think it was --
3              THE COURT:  I know that's your view.  I'm asking
4    you a question.  Answer it.  Because I -- as far as I
5    know -- but I could be wrong -- I mean, I've looked at these
6    transcripts and stuff, but it's been some time.  Is there
7    any testimony whatsoever that indicates that -- from anybody
8    that indicates that she was gently trying to keep her
9    from -- from moving up because of medical concerns?  Any
10   testimony whatsoever?
11             MR. MACHADO:  I believe maybe when she testified
12   on behalf of Ms. Harlow, her sister.
13             THE COURT:  Do you know?
14             MR. MACHADO:  I think --
15             THE COURT:  Does the government know if there's
16   anything?
17             MS. ROSS:  Your Honor, the only testimony to that
18   effect was the defendant's own words, which Your Honor found
19   to be not credible.
20             THE COURT:  I'm sorry.  Who's this?
21             MS. ROSS:  The defendant's own words when she was
22   testifying in her sister's trial.
23             THE COURT:  In the Harlow trial?
24             MS. ROSS:  Right.
25             THE COURT:  In terms of what she was doing.  Okay.
```

1          MS. ROSS:  That is what she claimed, Your Honor.

2          THE COURT:  Okay.  Sorry.

3          MR. MACHADO:  And, Your Honor --

4          THE COURT:  So you have to have testimony, and I

5    indicated that you, obviously, dispute my findings, but --

6    which you can do, but I've already ruled on it.  I thought

7    there was something about it.

8          MR. MACHADO:  Well, the other suggestion that I

9    would make, Your Honor, is also I said it was one or

10   the other, and she can recall what she saw was Ms. Marshall

11   [sic] actually physically getting up and using the

12   shoulder -- I mean, her -- what she did immediately was

13   stand up.  And so I would suggest that maybe she was using

14   the shoulder to brace herself, to be able to get up and that

15   she is an older person and needed that assistance.

16         But I understand the Court's finding as far as that

17   it was a restraint.  And I'm not trying to disturb that, but

18   what I'm saying is that perhaps the more logical conclusion

19   is one that is not as violent or forceful as -- as the

20   government would suggest.

21         With regard to -- continuing as far as the

22   involvement, this was organized by others.  She was just

23   there more to support her sister.  You didn't see her

24   carrying chains or locks or anything like that when -- when

25   she went in.  And -- but still was just by her sister's

1     side.

2          THE COURT:  But she did have something to do with

3     the chains once she was in the waiting room; right?

4          MR. MACHADO:  I don't dispute that, Your Honor.

5     But as far as intention coming in, the only thing that you

6     saw in her hands, that was much her own doing, was a

7     pamphlet that she was trying to give Ashley Jones.

8          So what I would suggest to the Court -- and

9     Ms. Marshall will probably touch on this.  She was not part

10    of that entrance, and she was not doing anything with regard

11    to the lock-and-block.  She believes in civil disobedience,

12    but that was not her motive on that day.  What she was --

13    what she felt her role, what she was going to do, was what

14    she did similar in -- in what we call these Red Rose

15    rescues.

16         THE COURT:  So I'm not sure.  What are you saying

17    she did in terms of the chains and the locks?  What's your

18    version?

19         MR. MACHADO:  Well, it appears from the video --

20    if the Court accepts that the video is how it happened,

21    there were others who were chaining themselves and locking

22    themselves, and it appears that there was some involvement

23    she had, as far as I'm concerned.

24         THE COURT:  So you're not denying she was involved

25    with it --

```
1                    MR. MACHADO:  Well --

2                    THE COURT:  -- or are you?

3                    MR. MACHADO:  I'm not denying that's what the

4        video shows.

5                    THE COURT:  Okay.

6                    MR. MACHADO:  So, now, there's --

7                    THE COURT:  One other thing in terms of Ms. Holler

8        and the push and whatever.  I mean, Ms. Holler did

9        testify -- and the one thing that I don't remember being on

10       the record -- and there would have been an opportunity to

11       certainly ask.  She was the person there.  I mean, did she

12       find that -- you know, that Ms. Marshall was actually

13       pushing her down, or was trying to help her?  I don't think

14       anybody asked her that particularly.  So we don't really

15       have any evidence from somebody who would know, unless I am

16       incorrect about this.

17                   MR. MACHADO:  Well, I -- I don't think that that

18       specific question was asked, but my -- what I would suggest

19       is that the -- the fact that Ms. Marshall was called in

20       order to assist this person, her nursing background, the

21       fact that she was holding her hand are things that would

22       indicate that she was there -- was trying to assist her.

23       And frankly, Your Honor, if she was -- you know, I guess the

24       whole point of this was to have people leave, I would say,

25       if that's -- if that was the goal, that people not proceed.
```

1    So it would be rather counterintuitive for Ms. Marshall to

2    try to keep the person there.

3            THE COURT:  Of course they did.  They wanted to

4    keep people there as long as possible because it closed down

5    the clinic.

6            MR. MACHADO:  No.  They -- patients.  I'm talking

7    about patients.  I mean, Shampy Holler presumably was a

8    patient.

9            THE COURT:  Okay.  And I believe that Ms. Marshall

10    exited the clinic for the hallway and implored Ms. Holler to

11    leave insisting, don't do this, don't do this.

12            MR. MACHADO:  There was -- I believe there was

13    also testimony about some people trying to get an ambulance

14    for her -- for Ms. Holler.  And so, I mean, I -- if there's

15    any desire -- I mean, it's not to keep her there.  It seems

16    the group wanted to make sure that she got the help that she

17    needed.  And I would suggest that that was what Ms. Marshall

18    was doing as well.

19            One thing I would --

20            THE COURT:  Can I ask one other quick question.

21    In terms of the -- and I didn't get a chance to go back and

22    look.  I was trying to remember.  Who is -- who is it that

23    testified about the getting -- going and getting the

24    ambulance?  I know people have talked about it, but I wasn't

25    sure whether we actually have any trial testimony relating

1    to it.

2           MR. MACHADO:  I don't know if it came out in our

3    case, Your Honor.  But I think in some other trials, at

4    least that was my understanding.

5           THE COURT:  Okay.  So in your trial -- that's what

6    I thought.  In your trial, there isn't any discussion about

7    going and getting the ambulance; is that correct?

8           MR. MACHADO:  That -- that's my recollection, but

9    I think there were other witnesses who talked about it or --

10   I'll defer to Ms. Ross.

11          MS. ROSS:  During the trial against the defendant,

12   there was no testimony on that point.

13          THE COURT:  Okay.  I have to go by what's in the

14   trial for each of these individual people.  I tried to --

15   that's why when I get to the statement of facts it's a

16   little jumpy because I'm making sure we're discussing things

17   in the context of a particular trial as to what evidence was

18   actually there and wasn't.  So in terms of the jury

19   listening to it, they would have heard nothing that

20   indicated that anybody -- I mean, clearly, she was --

21   everybody acknowledged in terms of -- even the

22   co-conspirators -- that it appeared to be a medical

23   emergency.  But I don't think, evidently, that in the trial

24   of Ms. Marshall there was any evidence that anybody went and

25   did anything.

1    MR. MACHADO:  No.  I mean, none of the defendants

2    testified at that trial, so.

3    THE COURT:  Well, you can bring it out through

4    other witnesses as well.  I mean, the clinic staff

5    testified.  Ms. Holler -- they may not have known one way or

6    the other about Ms. Holler, but certainly the clinic people

7    testified.

8    MR. MACHADO:  Well --

9    THE COURT:  Go ahead.  I'm just trying to make

10    sure that you're making an argument that fits with what we

11    have as a trial for her, not additional evidence that's not

12    there.

13    MR. MACHADO:  Understood, Your Honor.  Although I

14    guess the Court can take into consideration what it wants

15    for sentencing.  The Court has decided to score 2 points

16    because of her testimony in her sister's trial as part of

17    obstruction of justice.  Yet that was --

18    THE COURT:  I'm saying that the jury would not

19    have heard it.  I'm not suggesting that -- in terms of -- in

20    the other trial, maybe I can ask the government, do -- was

21    there actual testimony that an ambulance was called?  I know

22    that they discussed having the call, but was it actually

23    called?

24    MS. ROSS:  Your Honor, to the best of the

25    government's recollection, the only testimony was through

1    Defendant Marshall's co-defendants about attempting to get

2    an ambulance.  But there was no testimony that an ambulance

3    was actually called or that one came to the clinic.

4              THE COURT:  I thought it was ambiguous.  Okay.  Go

5    ahead.

6              MR. MACHADO:  And on the point of my client

7    testifying as far as Ms. Harlow is concerned, I understand

8    the Court found her testimony not believable, but I think --

9    and --

10             THE COURT:  On certain key points.  Not on

11   everything, obviously.

12             MR. MACHADO:  But the -- but as far as what I

13   would ask is for the Court to consider the fact that an

14   obstruction of justice -- and someone chooses to testify on

15   behalf of her sister as to facts about what happened should

16   be treated a little differently than her testimony in her

17   own case, as far as an obstruction of justice, Your Honor.

18   I think --

19             THE COURT:  I would expect the truth in both.

20             MR. MACHADO:  Of course.  Understood, Your Honor.

21   But I think that she was testifying to the best of her

22   recollection.  And we've talked about how just -- I said,

23   you know, memory is not as -- as good as it should be.  This

24   was an incident that happened, you know, years ago at this

25   point.  And so as we suggested -- although the Court has

1    ruled against us.  We understand -- recollections change and

2    they're not perfect, and sometimes it's not intentional.

3    We'd suggest that it's not -- leans more towards that than

4    an actual intentional slighting or trying to obstruct

5    justice and -- although the Court has already indicated the

6    2 points, and we noted our objection.

7              THE COURT:  I discussed it in my omnibus opinion.

8              MR. MACHADO:  You did, Your Honor.  I'm not

9    disputing that.  It's very clear the Court has ruled in that

10   way.  I don't have any issues as far as any ambiguity.

11        Your Honor, there's a couple things -- and one of

12   them is, frankly, an oversight on my part.  And I know that

13   to the extent that -- and it doesn't have any effect as far

14   as the point total, but there's -- and I failed to raise it

15   with the presentence report writer.  But there's a reference

16   to an arrest here in Washington, D.C., and -- and

17   Ms. Marshall has never lived in D.C.  And -- and, frankly --

18             THE COURT:  She denied it.  We have something that

19   indicates that she denied there was.  So we did not have any

20   paperwork, if I'm not mistaken, from probation.  So, you

21   know, she denies it.  That's it.

22        Am I correct, Probation?  I thought we didn't have

23   any specific paperwork to support it.

24             THE PROBATION OFFICER:  Thank you, Your Honor.

25   Hana Field with probation.

1           Just so I can understand, is that in regards to the

2    unlawful -- the arrest for an unlawful entry?

3           THE COURT:  This is the one that occurred here in

4    D.C., supposedly was Superior Court.

5           THE PROBATION OFFICER:  Right.  We had no

6    additional information.

7           THE COURT:  The arrest was listed, but you had no

8    further information; am I --

9           THE PROBATION OFFICER:  That's correct, Your

10   Honor.

11          THE COURT:  Okay.  She's denying it.  So I'll

12   accept her denial because we don't have anything to support

13   the arrest.

14          MR. MACHADO:  Although just on her behalf, she

15   wants to make the Court clear, she's been a member of the

16   Total Abstinence Society [sic] of the Sacred Heart, Dublin,

17   Ireland, for 35 years.  And so she was -- personally took it

18   as an affront that there was some suggestion of some

19   intoxication on her behalf when it's something that's been

20   very, very literally sacred to her as far as her

21   personality.  And so I understand the Court is not taking it

22   into consideration.

23          THE COURT:  I'm not.  I mean, if the government --

24   if the government -- if the probation does not have the

25   paperwork to support it from the court or whatever and the

1    defendant denies it, I -- you know, I will accept the

2    denial.

3                    MR. MACHADO:  Okay.

4                    THE COURT:  You don't have any proof that it

5    occurred.  Plus it's an arrest.  It's not talking about a

6    conviction.

7                    MR. MACHADO:  Thank you, Your Honor.

8            Well, with regard to the proper sentencing here,

9    Your Honor, we've made a point of asking for the Court to

10   consider some level of home confinement given her medical

11   issues.  We've referenced the sentencing guidelines with

12   regard to her age, as well as her physical condition.  I've

13   asked Ms. Marshall to address her physical issues, but I'm

14   going to try and summarize a good point of it, although

15   she'll probably do a better job of it.

16           But as the Court knows, she had a hip problem.  We

17   provided some documentation about that she needed hip

18   surgery, and that was something that was happening at the

19   trial.  When she was sent to Alexandria Detention Center,

20   she was not allowed to have the apparatus that she had to

21   assist her with her hip, and it's been getting worse and

22   worse.

23                    THE COURT:  Can I ask why none of this was for the

24   presentence report writer?  It's not in the presentence

25   report.

```
1            MR. MACHADO:  Well, I think there was talk about
2       her hip issues, Your Honor.  I think --
3            THE COURT:  Let me take a look.  What I have is --
4       hang on one second.  Let me look and make sure.
5            MR. MACHADO:  The defendant -- this is paragraph
6       120.  The defendant advises she has pain in her right hip
7       after putting on weight and due to the lack of activity in
8       the Alexandria Detention Center.  Also, since arrest she has
9       suffered from gastro reflux issues.
10           I mean, we did present it at the time of -- when we
11      were asking for the Court to consider to allow her to be
12      out.  We did explain -- and I think we provided the Court
13      with a document from a doctor in that regard.  But there is
14      reference to her hip, and it's just gotten worse.  And part
15      of something that I am at fault at is I thought that she was
16      taking some -- some medication in order to assist her with
17      her pain, but apparently she cannot because of her reflux.
18      It's affected by her ibuprofen.
19           She's actually at a point where she's going to need
20      surgery in her esophagus.  She has constant reflux, and at
21      this point she has an anatomical change in her esophagus so
22      it feels like there's something always there and so -- it
23      actually is something her -- her father suffered and -- and
24      died because of that.  And so it is serious.  And so we feel
25      that she hasn't been getting the best treatment.  She still
```

23

1     needs to see a gastroenterologist.  And we think given her

2     medical condition and given her age, that the Court consider

3     home confinement, a period of time as the Court feels

4     necessary, rather than -- rather than jail time, Your Honor.

5              THE COURT:  I have to say, if you indicated some

6     of these things to probation, it's not in the presentence

7     report.  I mean, it talks about the hip pain, but indicates

8     that she's -- you know, she's had -- has been periodically

9     seen for her hip, back pain.  They don't reveal any

10    abnormalities.  And in terms of history of reflux symptoms,

11    but didn't want any medication.  She would be continued to

12    be monitored, none of which indicates what you're talking

13    about.

14             MR. MACHADO:  Well, Your Honor, I mean, I -- she

15    has indicated --

16             THE COURT:  Is there something more recent that

17    you have learned since this was done?

18             MR. MACHADO:  Your Honor, she did make reference

19    to all of this, as I indicated, in one --

20             THE COURT:  Well, there's a big difference between

21    making reference from it and you're indicating that it's a

22    major problem.  If it is -- I mean, I certainly would want

23    to know it.  But I'm just saying I would hope that you would

24    let the presentence report writer know it so it would be in

25    there, unless it's come up since they wrote it.

1          MR. MACHADO:  It's gotten worse since it was

2     written.  It's slowly gotten worse.  You know, some things

3     have stayed the same, like the cataract surgery that she

4     still needs.  That's -- that's -- she was supposed to have

5     surgery on her right eye, but that hasn't been scheduled

6     yet.

7          THE COURT:  That is in there.

8          MR. MACHADO:  Yes.  And she also has osteoporosis,

9     as well as osteoarthritis.  And I'll let her address that as

10    well.

11         But, Your Honor, Ms. Marshall was doing -- and the

12    government indicates she -- that Ms. Marshall has her rights

13    to -- and her opinion, but I don't think that this is a

14    situation that the -- her actions should lead to a -- an

15    extensive jail -- jail sentence.  I think that the jury has

16    found her guilty, but I think this is a situation where she

17    was trying to do best by people, either by trying to pass

18    along information or as -- although we may disagree as far

19    as what was happening with Shampy Holler -- was trying to

20    get -- provide her with some assistance there.

21         And so for those reasons, Your Honor, we feel

22    Ms. Marshall should receive a more lenient sentence, and we

23    would ask for the Court to consider house arrest, home

24    confinement as the Court deems necessary, whatever time the

25    Court feels necessary.  I'm sure Ms. -- Ms. Marshall will

1    follow it to a tee, and I think it would just be better in

2    the long run for her, considering her age and her physical

3    issues.

4         Thank you.

5         THE COURT:  All right.  Ms. Marshall, did you wish

6    to address the Court?  If you do, you can stay seated as

7    long as you speak into the microphone instead of having you

8    stand at the podium.

9         THE DEFENDANT:  Thank you, Your Honor.

10         THE COURT:  If you're more comfortable there.

11         THE DEFENDANT:  Your Honor, in August of 2023, I

12    was brought by ambulance to the hospital for excruciating

13    pain in my hip and an inability to walk, sit, or lie down.

14    I was admitted to the hospital and treated for three days

15    with painful, powerful -- excuse me, powerful intravenous

16    anti-inflammatory drugs and painkillers and sent home with a

17    walker.  Although this wasn't the first time that I had been

18    hospitalized with this problem, I never wanted to experience

19    that kind of pain again.

20         I immediately scheduled an appointment with an

21    orthopedic surgeon at the New England Baptist Hospital in

22    Boston.  The surgeon told me that I had advanced

23    osteoarthritis in both hips but that the right needed

24    surgery, as the pain could happen or recur at any time.

25         Because I was incarcerated right after the trial, the

1    surgery, which was scheduled in October of '23, had to be

2    canceled.  I wore a hip belt to help keep my hips even to

3    prevent overworking my hip or the other, which leads to

4    inflammation and pain.  The belt was taken away from me in

5    jail because it had metal in it.

6         Last year I was diagnosed with osteoporosis and told

7    by my doctor to take plant-based calcium supplements and to

8    walk.  I cannot take these supplements in jail, and I

9    stopped walking because I began to limp and experienced

10   numbness in my leg and later discomfort.  Although I did get

11   another approved belt and have worn it, I'm afraid to walk

12   as I cannot take anti-inflammatory drugs here due to an

13   additional diagnosis which developed since my incarceration.

14   This GERD, or gastroesophageal reflux disease, is what my

15   father died from complications of.

16        I've taken another medication for this with no

17   abatement of symptoms.  I have a permanent sensation of

18   partial obstruction in my lower esophagus and may need

19   surgery for this as well.  The jail physician said to avoid

20   anti-inflammatory drugs with this condition.  I am now also

21   on anti-hypertensive or high blood pressure medication,

22   which I was able to avoid at home as I was walking and kept

23   my weight down.  Since incarceration and not walking, I've

24   gained weight, which doesn't help my blood pressure or my

25   hips.

1              Lastly, because I am single with no children, I have

2      lived in a safe and affordable 55-and-older apartment

3      complex for the last 12 years and must return there for

4      recertification purposes in January or become homeless, as

5      there's a long waiting list for affordable safe residences.

6      Your Honor, I'm requesting to be put on house arrest to

7      serve out my sentence in order to have necessary surgery or

8      surgeries and properly manage my medical conditions.

9              Thank you.

10             THE COURT:  I have a question.  What surgery are

11     they suggesting if you have osteoporosis or arthritis?

12             THE DEFENDANT:  Osteoarthritis would require a hip

13     replacement.

14             THE COURT:  So you're talking about a hip

15     replacement?

16             THE DEFENDANT:  Yes, Your Honor.

17             THE COURT:  Okay.  Any comment on the part of the

18     government on any of this?

19             MR. MACHADO:  Your Honor, may I have the Court's

20     indulgence.

21             THE COURT:  Sure.

22             MR. MACHADO:  Your Honor, there was some

23     additional things she wanted to read.  I told her this was

24     her opportunity.

25             THE COURT:  No.  That's fine.  I thought she had

```
1    finished.  That's what I was asking for clarification as

2    to --

3              THE DEFENDANT:  Your Honor, this is not in

4    relation to my health, but it has something to do with why I

5    was there on October 22nd.

6         If it pleases the Court, I would like to make a

7    statement.  Our rights and where another's rights begin, our

8    rights begin at conception.  This truth -- this truth -- was

9    recognized by the fathers of our nation when they said we

10   hold these truths to be self-evident that all men are

11   created equal.  Our forefathers went on to say that they,

12   men, are endowed by their creator with certain unalienable

13   rights, meaning these rights are given by God, not man.

14   And, therefore, as God-given human rights, they cannot be

15   violated, taken away, or denied.

16             THE COURT:  Okay.  If I can interrupt you.  If

17   you're about to go through --

18             THE DEFENDANT:  I'm just going to finish this.

19             THE COURT:  Excuse me.  Hold on.

20             THE DEFENDANT:  Your Honor --

21             THE COURT:  In terms of -- this is not a case

22   about the merits or lack of merits or people's views, which

23   I understand you have very strong views.  This is about

24   civil rights.  It's about a violent protest and about

25   obstructing people.  Under the D.C. law, they're entitled.
```

```
1    So this case is not about -- which you're about to go

2    into -- the morality or legality from your perspective of

3    whether abortion should be allowed in the District of

4    Columbia.  Okay?  That's not what this case is.

5         I understand you feel strongly about your views, and

6    you're certainly entitled to do it, and you're entitled to

7    protest peacefully.  But I -- there's no point in going

8    through -- you're not speaking to me.  You're speaking to

9    the gallery if you're going to discuss, in essence, the

10   evils of abortion from your perspective.  That's not what

11   the case is about.  But if you want to talk about something

12   else about the case, that's fine.

13        THE DEFENDANT:  I'm -- I just wanted to finish

14   this statement saying that a woman's rights are life.  Now,

15   a Polish priest and pro-life advocate by the name of

16   Father --

17        THE COURT:  You've got -- excuse me.  You've gone

18   ahead and --

19        THE DEFENDANT:  What --

20        THE COURT:  Excuse me.  You've gone ahead and

21   decided that you'll discuss the issues, the evils and

22   various other reasons --

23        THE DEFENDANT:  I --

24        THE COURT:  Excuse me.

25        THE DEFENDANT:  Okay.
```

```
1          THE COURT:  -- about it.  And I have been
2    indulgent in terms of allowing people to do a certain amount
3    of it.  But you've made your point in terms of -- from a
4    religious perspective.  Obviously, you believe that, you
5    know, abortion should not be allowed.  I understand your
6    views, and you've made that clear.  And you're entitled to
7    your views.
8          That's not what this case is about.  So going into
9    it, it's not something that the Court is going to decide
10   whether abortions are evil or not.  The Court is deciding
11   two statutes that go to civil rights.  So I'm not going down
12   the path of having a discussion about the abortion.
13         The idea of addressing the Court is for something
14   that the Court can consider, not, frankly, a statement for
15   the gallery.  So as far as I'm concerned, you've made your
16   point.  You view it as evil, and that it's -- as well as
17   that -- obviously, it's against your religion, et cetera,
18   and I accept your views.  That's not what the problem -- not
19   what the problem or what the case is about.
20         So if you have something else that doesn't get into
21   what you view as the evils of abortion, I'm happy to listen
22   to it.
23         THE DEFENDANT:  It did touch on civil
24   disobedience, but --
25         THE COURT:  You're allowed to have civil
```

1    disobedience, just do it peacefully.  And this was not a

2    peaceful -- unfortunately, a peaceful, you know, invasion or

3    intrusion or however you want to label it.  But peaceful

4    protests are fine.

5            THE DEFENDANT:  May I just speak to my lawyer for

6    a second?

7            THE COURT:  Sure.

8            (REPORTER'S NOTE:  A sotto voce conference was

9    held between the defendant and Mr. Machado.)

10           THE DEFENDANT:  Your Honor, this does pertain to

11   the fact that I was knocked around because my recollection

12   when I was --

13           THE COURT REPORTER:  I'm sorry.  You're speaking

14   too close to the microphone.

15           THE DEFENDANT:  My best recollection is when I

16   entered the abortion -- at the waiting area, I was

17   encountered by a huge shove from one single abortion worker

18   identified as the administrator of that clinic.  At no other

19   time did I have any contact with any other abortion worker.

20           THE COURT:  You were part of the group shoving or

21   pushing in; am I not correct?

22           THE DEFENDANT:  I'm sorry.  I didn't hear.

23           THE COURT:  You were part of the group that was --

24   after Ms. Handy and Mr. Smith went in, you were part of the

25   group that went forward and pushed in in terms of the group.

1    You weren't out coming in later; am I correct?

2            THE DEFENDANT:  I came in later.  And the only

3    encounter that I had with anybody was when an abortion

4    worker pushed me in the chest.

5            THE COURT:  I believe --

6            THE DEFENDANT:  That was the --

7            THE COURT:  -- you're mistaken.  You were --

8            THE DEFENDANT:  That is my recollection.  And she

9    was the only one left when I went -- I composed myself, and

10   I said to her, "We've come in peace, but you are assaulting

11   us.  That's a felony."

12           THE COURT:  You were ejected -- I fully agree that

13   you -- looking at the videos, it would appear that you were

14   part of the group that were pushing your way in.  But it's

15   correct that one of the nurses successfully ejected both you

16   and Mr. Geraghty.  So that is true, and at that point most

17   of them had been -- had gone in.  And you came back in at

18   that point.  So I'll agree with part of what you said.  But

19   I've looked at the video.

20           THE DEFENDANT:  I was trying to diffuse the

21   situation.  I didn't say anything.  But I know that civil

22   disobedience means that you do not defend yourself.  You

23   don't even talk and -- when you're in solidarity with,

24   basically, a child in the room who cannot do any of those

25   things.  So that -- that's my understanding of civil

1    disobedience.  And I did not lay hands on anybody in that

2    clinic.  She was the only worker that encountered me, and

3    she pushed me.

4         THE COURT:  Nobody suggested that you touched

5    somebody and pushed them.  What was suggested from the video

6    is that there was a large group that had come from the

7    stairwell and that you were grouped together -- if you look

8    at the video -- and you're pushing in; all of you were

9    together getting in.  You did get ejected by one of the

10   nurses and one of the people from -- there's no question

11   about that.

12        And then you came back in at a later point, but you

13   were certainly not waiting outside until everybody got in

14   and then you walked in.  You were part of the group that

15   went -- that was there.  Did you put your hands on the

16   nurse?  No.  Nobody said that.

17        THE DEFENDANT:  Your Honor, I was not pushing in a

18   group, and I was not pushing anybody.

19        THE COURT:  All right.  That's -- that's what you

20   said.

21        THE DEFENDANT:  That's the best of my recollection

22   because there was only one abortion worker that came and

23   encountered me.  There was only one abortion worker in that

24   waiting area when I went to -- was her pushing me out.  That

25   was it.

```
 1                THE COURT:  Okay.  Anything else?

 2                MR. MACHADO:  Your Honor, just one point, and I

 3     think --

 4                THE COURT:  You need to come up here.  We can't

 5     hear you from here.

 6                MR. MACHADO:  Yes, Your Honor.  Apologies,

 7     Your Honor.

 8           Just the one thing, while the Court has said that she

 9     was part of that group, I think that the video showed that

10     she was towards the back of the group.

11                THE COURT:  I'm not suggesting she was in front.

12                MR. MACHADO:  I just want to make sure I --

13                THE COURT:  The person that was in front was

14     Ms. Handy and Mr. Smith and some other people.  But she

15     certainly was there.  She was not waiting in the hall for

16     them to go in.

17                MR. MACHADO:  I understand.

18                THE COURT:  What we have is video.  So it's not

19     like you have to decide who's credible about what happened.

20     You can look at the video and see where people are in the

21     video.  There's more than one video.

22                MR. MACHADO:  Okay.  I just wanted to make that

23     clarification.  I understand the Court already had that.

24     Thank you.

25                THE COURT:  Okay.
```

1          THE DEFENDANT:  May I just add, Your Honor, it

2     also shows in the video I have my hands on another abortion

3     worker.  That never happened.  That I was turning around

4     with her; that she put me -- at one point in her -- the

5     abortion worker's testimony, when she is asked, by -- I

6     believe it was one of the defense lawyers -- if that was her

7     pushing Ms. Marshall into the chair, and she denied it.  She

8     denied it.  But nobody picked up on that, and I can honestly

9     say that I had -- I never had hands on anybody else.  When I

10    encountered --

11         THE COURT:  I'll accept your statement.

12         THE DEFENDANT:  Okay.  Thank you, Your Honor.

13         THE COURT:  I'll accept your statement.

14         THE DEFENDANT:  Okay.  Okay.

15         THE COURT:  All right.  What I'd like to do is to

16    take a short break.  I want to discuss one quick thing with

17    the probation office and -- officer, and then I'll come

18    back.  Unfortunately, we're going to push the one sentencing

19    back.

20         MS. ROSS:  Your Honor, may the government be heard

21    briefly?

22         THE COURT:  Sure.  Absolutely.

23         MS. ROSS:  Your Honor, just a couple things for

24    the record.  The video evidence did, in fact, show the

25    defendant pushing and shoving a clinic worker.  That was not

1    only elicited through testimony during the defendant's

2    trial, but we have also briefed that issue.  And I will just

3    direct Your Honor's attention to Government Exhibit 1001,

4    and that's at time stamp 21:06 to 21:06:10.  And that was

5    something that the defendant was confronted with during her

6    testimony during Defendant Harlow's trial.  And despite

7    seeing the indisputable video evidence to the contrary, she

8    denied that it was her who's pushing and shoving the clinic

9    worker.

10        And that was during the October 25th trial

11    transcript, and that's at page 271, line 19 through

12    page 272, line 22.  And so Defendant Marshall did not just

13    push Ms. Holler down, but she was also pushing and shoving

14    one of the clinic workers in order to make it into the

15    reception area.  The other thing I wanted to correct for the

16    record was -- there was testimony elicited from Ms. Holler

17    about being pushed by the defendant.

18        And the last thing the government will just note,

19    briefly, is that while the defendant has had weeks and

20    months to put together the necessary supporting document

21    to -- necessary documents to support her various medical

22    ailments here, she has not provided a single document to

23    support those, let alone asserted anything here that appears

24    to be something that the Bureau of Prisons cannot take care

25    of.

1          So the government will just note that it is -- it

2    appears to be a last-ditch effort to raise concerns at, you

3    know, the last second and, certainly, nothing she has said

4    is supported by any sort of medical documents or doctor's

5    note, and she has had more than ample time to put that

6    together.

7          THE COURT:  In terms of Ms. Holler, can you

8    indicate in terms of where in the -- I need to go back and

9    look -- whether or not she had been asked.  I take it

10   Ms. Holler was asked.

11         MS. ROSS:  Ms. Holler was shown that -- that

12   specific clip where she was pushed down.  She was asked

13   about it, and she indicated she had been pushed.

14         THE COURT:  Was that in this trial?

15         MS. ROSS:  Yes, Your Honor.

16         THE COURT:  Involving Ms. Marshall?

17         MS. ROSS:  Yes.  To the best of the government's

18   recollection, that is correct.

19         THE COURT:  Okay.  Let me -- the point about the

20   medical support would be helpful.  I believe that the

21   probation office would have received the materials from the

22   Alexandria jail -- is that correct? -- or not?  As to

23   whether they would have anything in there that supports she

24   needs all the surgery, et cetera.

25         THE PROBATION OFFICER:  Your Honor, the only

1    medical records we received from the Alexandria jail we

2    noted in paragraph 121 of the presentence report, which I

3    believe Your Honor read on the record.  Those were the only

4    records we received from the jail.

5        THE COURT:  So is there anything that -- when you

6    did receive it from the jail that suggested that she needed

7    any kind of surgery?

8        THE PROBATION OFFICER:  Not to my knowledge,

9    Your Honor.  The only information is just -- the information

10   received is just what we've reflected in the paragraph.

11       THE COURT:  All right.  Thank you.

12    Mr. Machado, is there anything that reflects --

13   usually, if they think there needs to be some surgery, they

14   say so.

15       MR. MACHADO:  Yes.  Your Honor, I --

16       THE COURT:  They actually do it.

17       MR. MACHADO:  We do have a letter we had provided

18   to the Court as far as her hip issue back when she -- when

19   we're trying to maintain her --

20       THE COURT:  I don't recall it indicating surgery.

21       MR. MACHADO:  It indicated there was -- I'll pull

22   it out.  But, Your Honor, if this is of concern to the Court

23   and -- I mean, I have no reason to doubt Ms. Marshall, but

24   it seems like we have a lack of documentation; I'll be happy

25   to supplement and perhaps we can --

1          THE COURT:  Remind me who the letter was from.

2          MR. MACHADO:  Her doctor.  Court's indulgence.

3          THE COURT:  I mean, she's been --

4          MR. MACHADO:  Yes.  It was a Dr. Talmo.

5          THE COURT:  But is that an outside doctor or the

6  doctor at the facility?

7          MR. MACHADO:  That was -- yeah, her outside doctor

8  from -- in Boston.

9          THE COURT:  And this indicates she may need

10  surgery or she does need surgery?

11          MR. MACHADO:  Yes.  That she had a scheduled

12  surgery.

13      Court's indulgence, if I may.

14          THE COURT:  Okay.

15          MR. MACHADO:  I'm trying to pull up the letter,

16  Your Honor.  Thank you for your patience.

17          THE COURT:  No.  That's fine.  It would be helpful

18  to know what they said or didn't say about surgery.

19      Do you know something, Ms. Ross?

20          MS. ROSS:  Your Honor, the government has read

21  that letter.  And, again, the government just wants to

22  assert that she had that surgery scheduled for right after

23  the trial, I believe, but nothing -- you know, this is

24  surgery that --

25          THE COURT:  So was that hip replacement?

1          MS. ROSS:  That's the government's understanding,

2     yes, Your Honor.  But it is the government's assertion --

3     and certainly that this is the type of surgery that the

4     Bureau of Prisons can handle routinely if it is something

5     that she needs imminently.  And certainly no documentation

6     has been provided that she needs that surgery imminently or

7     that she's in any sort of risk of imminent harm or anything

8     by delaying that surgery.  And, certainly, she hasn't had

9     that surgery or the Bureau of Prisons hasn't found that

10    she's needed that surgery in the time --

11         THE COURT:  Well, it's not the Bureau of Prisons.

12    It's the facility, and it's the Marshal Service that makes

13    the arrangement.  I'm not going to dispute -- she's

14    indicated that there was scheduled surgery.  So that's not

15    in dispute then.

16         MR. MACHADO:  Your Honor, the letter -- this was

17    dated September 14th, 2023.  It says, "The letter is to

18    inform you that Jean Marshall is currently a patient under

19    my care.  On 8/24/23 Jean was seen in my office for a visit

20    regarding her hip pain.  At that visit it was recommended

21    that she has a right total hip replacement to treat her hip

22    osteoarthritis.  This is elective surgery.  She is

23    tentatively scheduled for her hip replacement on 10/24/23.

24    If you have any questions or concerns regarding this matter,

25    please feel free to contact my office."  And it's signed

1    Carl, C-a-r-l, T. Talmo, T-a-l-m-o, M.D., and it's from the

2    New England Baptist Hospital.  And this letter --

3            THE COURT:  So she could schedule it and she

4    perhaps did.  But it sounds like it's elective surgery,

5    which doesn't make it sound like she needs it imminently.

6    But at any rate, that's in the letter.

7            Let me take a break.  I need to consult with the

8    probation office for a few minutes, and I'll come back out

9    and complete the sentencing.

10           So it's 20 of 3:00.  Give me 10 minutes.  I always

11   underestimate.  So give me 10 minutes.  It's a quick

12   question.

13           MR. MACHADO:  Yes, Your Honor.

14           (Recess taken.)

15           THE COURT:  All right.  In terms of the records on

16   the issue, obviously, the letter, which nobody is disputing,

17   indicates a recommendation for hip replacement, indicates it

18   as an elective procedure, which means they're not -- they're

19   recommending it.  So they wouldn't refuse to do it, but it's

20   her decision whether to do it, which doesn't put it into

21   something that I would view as something urgent.

22           It also appears -- probation looked through the

23   records more carefully -- that in September of 2023, the

24   Alexandria facility received records from Boston in terms

25   of -- relating to her, and it mirrors what was in the

1    letter, a recommendation for hip replacement.  But it was

2    presented as something that's elective, which matches what

3    was in the letter.  And they don't appear to have done --

4    they being Alexandria -- to have done their own assessment

5    to make a decision one way or the other as to whether or not

6    they would go ahead and schedule it.

7        So I think I would read it in the context that there

8    is a recommendation for elective hip replacement surgery,

9    you know, on the record.  I don't think it's something that,

10   you know -- that the Bureau of Prisons, should I decide to

11   do that, is incapable of taking care of something like this.

12   So we'll move on.  As far as I'm concerned, I think we've

13   covered the issues that needed to be done.

14       Let me just indicate after -- when I get to the

15   statement of offense that, obviously, I looked carefully at

16   it in each trial.  I can't say that I remember each thing.

17   However, that's why I'm doing it from written opinions,

18   which at the time I looked at the testimony on each one of

19   these issues that were controverted, as well as just in

20   general in terms of the videos, the testimony relating to it

21   in coming to the conclusions that I did.

22       So the best, most accurate from my perspective is

23   what I have in my written opinions because at the time I

24   actually went through all of the evidence on that issue to

25   make sure that there was support for whatever position.  And

1    from my perspective, I have a neutral position on this.  I

2    have no feelings one way or the other in terms of how it

3    should come out in terms of what -- if there's controversy,

4    I want to look because we have the benefit of videos and not

5    just testimony that has made it easier in terms of taking a

6    look with the testimony, if there is testimony, as to

7    precisely what's happened.

8        Because you can see generally -- now, in instances

9    where it's ambiguous, I've either indicated that or not put

10   it in.  But I have relied on it in the context of when I

11   wrote these, as I said, to look very carefully at each one

12   of these pieces of evidence that go around, what's in --

13   what I'm going to be talking about.

14       But let me move at this point to the issue of the

15   rest of the information that I need to consider under 3553,

16   one of which is, in addition to the advisory sentencing

17   guidelines, which I did go over, the Court considers the

18   pleadings, arguments, and record in this case, in addition

19   to the following information in determining a fair,

20   appropriate, and reasonable sentence in conformance with the

21   factors set out in 18 U.S.C. 3553(a) and subsequent sections

22   except for (e).

23       Ms. Marshall is 74 years old.  In criminal history,

24   she has no convictions.  The arrests that were listed she

25   denies, and we have no paperwork to contradict her denial.

1    So I'm not going to consider them.

2         In terms of education, she's a high school graduate.

3    She also graduated from Boston College with a nursing

4    degree, and she had a licensed registered nursing -- or was

5    a licensed registered nurse from 1970 to 2022.  In terms of

6    job history, she retired from nursing.  She was

7    self-employed as a home health care nurse for about

8    10 years.  And from 2004 to 2005, she was a registered nurse

9    at Pembroke Hospital.

10         Financial condition, she was not

11   cooperative with the information.  I didn't get any -- or

12   actually not me, but the probation office got no release

13   forms.  So we have limited information.  She owns a car.

14   There's really not much else.  I, frankly, on the record I

15   have, cannot conclude that she doesn't have the financial

16   ability to pay a fine.  However, I'm not planning on

17   imposing a fine.

18         In terms of mental health or emotional issues or

19   substance abuse, there's no issues under either of those

20   categories.

21         Physical condition, as we've talked about, allergic

22   to dust, osteoporosis, needs cataract surgery in one eye.

23   She had it in one but not the other.  Hypertension, high

24   cholesterol.  She evidently is on some medication.  The hip

25   issues we've discussed, which she evidently has -- has the

1    prospect of an elective hip replacement surgery.  And we've

2    got limited documentation on it, but I'll accept that it's a

3    recommendation for elective surgery, which she can decide to

4    have and evidently she was thinking of doing it.  In terms

5    of the esophagus, I don't have too much information, but

6    what's in there I'll accept.  That does raise it as an issue

7    that does need to have attention paid to it.

8         On a personal basis, she was born into an intact

9    union.  Her father's deceased.  He was a textbook salesman.

10   Her mother is deceased.  She was a registered nurse.  She

11   has three living siblings.  Two are nurses, and one is a

12   carpenter.  And she does have a brother who's deceased.

13   There were no issues growing up.  She's not married.  She

14   has no children.  And she has been living, as she's

15   indicated, in a retired-community setting.

16        In terms of the statement of offense, let me indicate

17   that the focus was on the conspiracy charge in terms of --

18   as well as the second FACE conviction.  But the conspiracy

19   charge, the actions and statements of co-conspirators can be

20   considered by the Court -- and they're included in this

21   recitation -- as long as they show that it furthers the goal

22   of the conspiracy and are reasonably foreseeable by

23   Ms. Marshall and that are covered within the scope of the

24   conspiracy and the goal of the conspiracy.

25        So in terms of the factual information, there's a

1      little bit of jumping around that I need to do because I'm

2      taking it from different opinions, which, as I've indicated,

3      for all of this I have looked carefully at, and my opinion

4      cites to, transcripts, videos, exhibits, or whatever.  So

5      it's not just one thing, but it is what was evidence and

6      what was considered and not just what people dispute or have

7      said one way or the other.

8           So in terms of the background, the government

9      presented their case through video, documentary, and

10     testimonial evidence demonstrating -- I concluded that each

11     of the ten defendants in this case successfully schemed to

12     disrupt access to a reproductive health clinic in the

13     District of Columbia on October 20th, 2022.

14          Ms. Handy was the one who orchestrated the conspiracy

15     to start with, directing her co-defendants and

16     co-conspirators to undertake various preparations to

17     blockade the clinic.  For example, Ms. Marshall, along with

18     Ms. [sic] Hinshaw, Bell, and Harlow, used chains and rope to

19     block the clinic's doors.  Ms. Handy made an appointment at

20     the clinic under a false name in order to make sure that she

21     could enter and then allow her co-conspirators to enter

22     shortly thereafter.

23          Mr. Smith's entry, he was at the front with

24     Ms. Handy, was particularly violent causing a nurse to

25     stumble backwards and severely injure her ankle in terms

1    of -- there were photographs that indicate it's bruised,

2    it's very swollen, and clearly she was in pain.  Ms. Handy

3    then directed others to blockade the clinic's doors, keeping

4    potential patients out.

5        As to the conspiracy, much of the government's

6    evidence centered on Ms. Handy's written communications with

7    others in terms of how this was set up and what was involved

8    with the conspiracy and the expectation of what was going to

9    happen.  Also, the trial testimony, particularly of Caroline

10   Davis, an unidentified -- an unindicted -- excuse me --

11   co-conspirator.  There were, obviously, other people who

12   testified, including the two victim patients, as well as the

13   clinic staff.

14       The conspiracy to disrupt the clinic began with

15   messages exchanged between the leaders, which I have found

16   is Ms. Handy and Mr. Darnel.  On September 11th, 2020, they

17   began planning an event with Mr. Darnel, sponsored through

18   Ms. Handy's pro-life organization Mercy Missions, discussed

19   forthcoming civil disobedience, also labeled a traditional

20   rescue.

21       The traditional rescue sort of morphed into something

22   more later.  But Ms. Handy explained initially to certain

23   responding police officers on the day of the incursion that

24   it entailed, quote, blocking the entrance to an abortion

25   facility and to not allow people to go inside.  Ms. Handy

1    and Mr. Darnel, the organizers/leaders, then began promoting

2    this event in various social media groups, broadly center

3    around D.C.

4        Ms. Handy also promoted the event with Mr. Geraghty.

5    He helped.  They worked together to draft press releases for

6    the rescue so it would -- you would get more participants,

7    as well as some monetary contribution.  There was also --

8    Ms. Handy arranged for housing for Ms. Idoni, Hinshaw, Bell,

9    Harlow, Ms. Marshall, and Mr. Goodman.

10        The initial rally point was the house of a local

11    pastor the night before.  Ms. Caroline Davis, the

12    cooperating co-conspirator, explained that Mr. Darnel and

13    Ms. Handy led the initial meeting to discuss the planned

14    rescue.  Ms. Handy and Mr. Darnel explained that there would

15    be two groups:  the less-obstructive protesters outside to

16    counsel women entering the building that has the clinic and

17    then activists inside or directly outside the clinic who

18    would disrupt the clinic's operations.  This latter group

19    would engage in a, quote, traditional rescue, which

20    Ms. Davis understood to mean blocking the doors to get the

21    clinic shut down for the day and prevent termination of a

22    pregnancy.

23        Ms. Handy termed this plan in another way:  risking

24    arrest.  Ms. Handy and Mr. Darnel then asked the attendees

25    to raise their hands if they intended to risk arrest, at the

1    very least, for blocking the door to the abortion clinic.

2    Ms. Davis further testified that some co-conspirators

3    advocated for bringing additional use of locks and chains,

4    and the -- the group planned other tactics, including going

5    limp during any arrest and the use, of course, as I

6    mentioned, of the fake appointment.

7         The following morning, the defendants got together

8    near the clinic and had a last discussion about what was

9    going to happen.  They also coordinated who would be

10   responsible for the blue bag that contained the ropes,

11   chains to be used.  After additional discussions and posing

12   for a group photo, the group departed for the clinic to

13   begin the successful obstruction of the clinic's operations.

14        The group split into three when they got to the

15   building.  First, Ms. Handy entered the building and went to

16   the clinic's main entrance in an effort to gain entry using

17   her fake appointment.  The second group was a group that

18   hid -- and that included Ms. Marshall -- in an adjoining

19   staircase, used as a fire escape, to avoid detection waiting

20   for the clinic door to open so that they could rush in.

21   Third, activists who did not intend to actively blockade the

22   clinic and Mr. Darnel stood outside the building housing the

23   clinic waiting for the blockade to begin.  And he was

24   filming it -- livestreaming it.

25        Ms. Handy attempted to enter the building using the

1    fake appointment.  This ruse was not as successful as they

2    had hoped because the clinic manager recognized Ms. Handy

3    from a prior time that she had come to the clinic a year

4    earlier.  But Ms. Handy did manage to get in.

5          After the first two patients entered, then the clinic

6    staff attempted to shut the door on Ms. Handy and Mr. Smith

7    who were at the front trying to go in.  Mr. Smith fought

8    against one nurse, shoving the door open and the nurse

9    backwards, causing the nurse to severely sprain her ankle.

10   And I already talked about that earlier.  A melee ensued.

11   The clinic managers rushed from the medical procedure area

12   into the waiting room with a broom to attempt to erect a

13   barrier separating the two patients from Ms. Handy, Smith,

14   and their co-conspirators.  That was not successful.  Ms.

15   Bell slipped through an opening dragging Ms. Harlow with her

16   while Mr. Smith fought with the nurse.

17         Video evidence demonstrates Mr. Geraghty standing

18   between Ms. Harlow and Ms. Marshall, quote, forcibly,

19   unquote, pushing forward at the same time.  Ms. Marshall

20   pressed her way in as well, though a nurse successfully

21   ejected both she and Mr. Geraghty moments later.  By that

22   point the portion of the group had successfully shoved their

23   way into the clinic, and Mr. Goodman and Ms. [sic] Hinshaw

24   had walked in later, needing less restraint.

25         After Ms. Marshall successfully entered the clinic,

1    she, Ms. Harlow, and Bell began distributing the locks and

2    chains.  After Ms. Bell affixed her own bike lock to her

3    neck, Ms. Harlow quickly retrieved the chains from the bag

4    and passed it to Ms. Marshall.  Ms. Marshall, Bell, and

5    Harlow immediately began to tie the chain to the two

6    respective bike locks.  While Ms. Handy ordered various

7    co-conspirators to block certain doors, she gave directions

8    as to where everybody should go.

9         As the group moved waiting room chairs to block the

10   main entrance as directed by Ms. Handy that would go into

11   the medical procedure area, Ms. Harlow, Bell, and

12   Ms. Marshall wrapped rope and chain around Mr. Smith and

13   Mr. Hinshaw.  Once connected, the group sat in a row of

14   chairs to block the entrance to the medical procedure area.

15        Police then responded, and when the officers

16   attempted to remove the chains connecting everybody,

17   including Ms. Marshall, Harlow and Ms. Marshall insisted to

18   the officers that they could be injured if he tried to do

19   that.  So they didn't -- that was not what they did.

20        Now, at the same time, what's going on is that

21   another -- another patient, Ashley Jones, who was seeking to

22   terminate her pregnancy is in the waiting room pleading with

23   the group blocking the door to the medical procedure area.

24   Ms. Harlow and her co-conspirators would not let Ms. Jones

25   through.  And Ms. Marshall shouted at Ms. Jones, quote,

1    Welcome to the adult world, unquote.  Ms. Jones then tried

2    the employee entrance that was -- come in through the

3    hallway.  Ms. Idoni and Mr. Goodman and somebody else

4    blocked that door.  Officer Whyte tried to direct them to

5    move.  They indicated they would not and could not and so

6    they didn't move.

7        Because Ms. Jones could not enter the medical

8    procedure area, she was very distraught, crying, begging

9    them to let her through.  She instead decided to jump

10   through a small window that separated the waiting room from

11   the billing area.  So what she did is she moved a chair

12   closer on to the window, climbed onto the window, climbed

13   through the window, although barely making it, so that she

14   could get through to the treatment area, visibly angered --

15   and you can see it on the video -- Ms. Marshall then moved

16   from blocking the medical procedure door to sit directly in

17   front of the small window so nobody else could use that

18   chair to climb through.

19       Meanwhile, Mr. Darnel narrated the unfolding blockade

20   on a Facebook livestream.  He began by explaining that in

21   the clinic co-conspirators were conducting a block-and-lock

22   [sic] rescue in which ten pro-life people were bonding

23   together physically to prevent the murder of preborn babies.

24   Mr. Darnel explained that Ms. Harlow and others were

25   intervening with their bodies to engage in a blockade so

1    disruptive that nothing like that had occurred, quote, in

2    over 25 years, unquote.

3         The purpose of this collective endeavor was, quote,

4    to prevent women from entering the clinic to murder their

5    children, unquote.  The plan, however, was to go down with

6    the ship, quote, when police began to arrest people.

7    Mr. Darnel filmed the beginning of this process when he

8    entered the clinic approximately 25 minutes after the

9    blockade had begun, and he -- he filmed the whole blockade

10   through the period when the co-conspirators were arrested,

11   although he was not arrested.

12        In addition to Ms. Jones, video evidence demonstrated

13   that the group impeded the second patient, who was out in

14   the hallway, Ms. Holler, in accessing termination services

15   that day.  She was there with her husband.  She was

16   attempting to enter the clinic through the public entrance,

17   which is also a staff entrance as well, because the group

18   blocking the doors, along with Mr. Geraghty -- and that was

19   the staff entrance -- would not let them through.

20        After this unsuccessful effort to enter the clinic to

21   get her scheduled medical services, she collapsed on the

22   floor in pain.  Ms. Marshall then exited the clinic to the

23   hallway and implored Ms. Holler to leave, insisting "Don't

24   do this.  Don't do this," in quotes.  When Ms. Holler

25   attempted to stand up, Ms. Marshall pushed Ms. Holler back

1    down to the floor.  And I would point out that it's quite

2    clear looking at it, plus there is the testimony in this

3    particular trial, evidently, from Ms. Holler who would

4    certainly know what it appeared -- seemed to be doing in

5    terms of the attention that Ms. Marshall was paying her.

6         When police began arresting the group, Ms. Marshall

7    and Ms. Bell acted according to the plan discussed at the

8    evening meeting and refused to cooperate.  Ms. Marshall

9    leaned over Mr. Hinshaw to prevent the police from removing

10   the rope and chain tied around him.  Ms. Bell insisted that

11   the police take a saw to the bike lock that she had affixed

12   around her neck rather than removing the bike lock herself.

13        She also forced police to place her in a wheelchair

14   rather than walk out of the clinic.  The last to be removed

15   was Ms. Harlow.  She employed similar tactics.  So nobody

16   walked out on their own at that point in terms of those who

17   had been with the chains and locks.

18        So in terms of the -- there was a victim impact

19   statement that was filed.  This was the nurse at the

20   facility that was injured when she fell backwards when

21   Mr. Smith, particularly, had pushed the door back against

22   her when the defendant and the co-conspirators were forcibly

23   pushing the staff back in order to get in, which they were

24   able to accomplish.

25        Her ankle was injured.  Originally it was thought to

1    be broken, but it turned out it was not.  Photos show how

2    swollen and bruised it was and how much in pain she was.

3    And she wound up having to wait about an hour and a half to

4    two hours before she could actually have any medical

5    attention for herself.  In the letter, she indicates the

6    residual effect, both physically and psychologically, that

7    occurred with the -- with this blockade.  She left the

8    clinic employment.  She was too anxious that this would

9    recur and that it would -- she could be injured again.  It

10   affects -- it affects her choice of future jobs.  Physically

11   she's not as nimble as she had been, which has created some

12   issues in terms of her choices of employment and

13   psychologically has left her traumatized.

14         So this is a serious offense.  It's about violating

15   the civil rights of patients seeking health care and the

16   staff who provide it without interference and physical

17   obstruction.

18         Count 1, the conspiracy of rights, you and the

19   co-conspirators engaged in a violent entry into the clinic.

20   As I said, the one person was injured, the staff member.

21   You obstructed the patients and staff -- specifically the

22   two patients that were trying to get care -- in order to

23   prevent them from receiving the health care -- abortions --

24   which are legal in the District of Columbia.

25         Count 2 is specific to abortions in terms of the FACE

1    Act and doesn't -- and not physically obstructing access to

2    a health care facility -- health care facility, including

3    those that provide abortions.  So it's a different statute.

4         We've gone over the facts, and I would just highlight

5    what I view as some issues that stand out for me.  You were

6    there at the meeting before with the co-conspirators.  You

7    hid in the stairwell when the door to the clinic opened.

8    You and others rushed over, and the whole purpose was to try

9    and push the staff back so that you could get in.

10        You helped rearrange the chairs in the waiting room,

11   clustered them around the treatment room door so people

12   couldn't get in.  You were seated in the chairs.  Ropes

13   would bind them, including you.

14        Ms. Jones comes in.  She's one of the people that is

15   seeking the treatment and is seeking to go through the door.

16   She's distraught.  She's crying.  She's begging to be

17   allowed to go into the treatment area.  There's no sympathy

18   there.  The -- there's a movement once she gets in to --

19   goes through the separation -- I mean, the reception

20   window -- Ms. Jones -- Ms. Marshall goes over -- and you can

21   see it in her manner, in both her face -- angrily moving the

22   chair closer to the window so then nobody would be able to

23   get through the treatment -- through the window into the

24   other side of the reception area, like Ms. Jones did.

25        Ms. Holler is there with her husband, also trying to

1    receive care.  She's in pain.  She's lying on the floor.

2    Again, both she and her husband are entreating both you and

3    the co-conspirators to let her into the treatment area

4    through the staff entrance.  As far as I'm concerned, the

5    evidence shows that when she tried to stand up -- or tried

6    to stand up, that she was pushed by you.  It's -- and it's

7    clear to everybody that she has a medical emergency.

8         So the one thing that I've said in some of these

9    cases -- and I think it applies in this one.  It doesn't

10   apply in perhaps some cases, based on the fact that they --

11   the co-conspirators were not interacting with the -- with

12   those that were in the waiting room or in the hallway, such

13   as Mr. Darnel.  But I found it, as I've said, disheartening.

14   I understand you and your co-conspirators have very strong

15   views about abortions, and I have no -- you know, that's --

16   you're entitled to have your views.

17        But we watched the video very carefully, and I

18   observed that neither you nor any of the other

19   co-conspirators showed any direct compassion, empathy to

20   these two women patients, victims, as human beings;

21   something that would indicate their -- you know, accepting,

22   comforting them in terms of their pain.  Your views in terms

23   of that they should not have abortions took precedence over

24   their human needs.  No caring, no sympathetic gesture.  I'm

25   sorry.  I looked at the video, and I don't see it the way

1    you seem to.

2        It was -- you know, the discussions, et cetera, were

3    very cold and calculating.  And I have to say, it's totally

4    contrary to, you know, a description of what your views are

5    and that you would be caring under -- and somebody who would

6    be compassionate about these issues.  I did not see you

7    with -- in that interaction either with Ms. Jones or with

8    the patient.  And it would have nothing to do -- it wouldn't

9    in any way undercut what your views were and what you were

10    trying to stop.

11        Now, in terms of parity, since there's no other cases

12    that have been charged -- there's no other sentencings at

13    this point that have been imposed other than -- this is the

14    first case; so we don't have a lot of information to go by.

15    Besides the factors in 3553(a), there's some additional

16    factors that I think are -- that I've included that I can

17    have for all of the defendants and co-conspirators to look

18    and at least consider some parity within the actual

19    co-conspirators themselves in terms of what they did, didn't

20    do, et cetera.

21        So what I've put in here is age, which the Court can

22    consider is an item for a departure or variance; the offense

23    level; if there's any obstruction, which would be the

24    testimony; the role, if there was any, enhancement role;

25    criminal history; and, importantly, there is a judiciary

1    sentencing platform that you can access that discusses or

2    sets out information about comparable cases.  It looks at

3    the statute.

4         Now, these statutes have not been employed other than

5    the four cases, as far as -- as far as I've been told.  I'll

6    put it that way.  But, certainly, they looked at the offense

7    level, the criminal history, also other factors associated

8    with these cases as -- in terms of other cases that you

9    could use as something comparable.  And they come up with

10   what they think is -- you know, looking at all of these

11   different issues.  And it's more complicated than that.  I'm

12   giving a very simplistic view of it.  They come up with what

13   they view as the median or the average in terms of sentence

14   in these types of cases, and I've also set out the guideline

15   ranges and any aggravating or mitigating factors.

16        So in terms of looking at Ms. Marshall -- and I have

17   to say, I've gone back and forth on this, but I think,

18   ultimately, that there -- a variance should be provided.

19   How much of a variance I have given some great thought to.

20        But, anyway, Ms. Marshall is 74.  So age is a factor.

21   The offense level is 20.  There is obstruction relating to

22   her testimony.  She does not have an enhancement based on

23   her role.  Her criminal history category is I.  The

24   judiciary findings put it at 27 months as, more or less, the

25   median with the same range, which would be the 33 to 41.

1    There are no priors in terms of -- for Ms. Marshall,

2    and I will take at least some consideration in terms of --

3    that she does have some issues, although I don't think it

4    prevents her from receiving a sentence of incarceration.

5    The Bureau of Prisons is appropriately capable of doing

6    these types of surgeries and these types of medical

7    services, particularly now since a lot of their populations

8    are getting older and faced with the same types of issues.

9    So I will sentence her to 24 months.  It's 9 months

10   lower than the lowest of the 33.  It's a 27 percent

11   reduction and, basically, goes to 3 levels.  I think a

12   combination of her age and her medical issues place her

13   lower than some others who have, more or less, the same

14   factors that I've looked at but received the 27 months.

15   So let me do the sentencing.  Pursuant to the

16   Sentencing Reform Act of 1984 and in consideration of the

17   provisions of 18 U.S.C. § 3553, as well as the advisory

18   sentencing guidelines, it's the judgment of the Court that

19   you, Jean Marshall, are hereby committed to the custody of

20   the Bureau of Prisons for an aggregate term of 24 months,

21   which is 2 years, which consists of concurrent terms of

22   24 months on Count 1 and 12 months, 1 year, on Count 2.

23   You're further sentenced to serve 36 months, 3 years,

24   term of supervised release as to Counts 1 and a 12-month

25   term, 1 year, as to Count 2.  Those terms are to run

 1    concurrently.

 2         In addition, you're ordered to pay a special

 3    assessment of $125 in accordance with the statute.

 4         While on supervision, you'll abide by the following

 5    mandatory conditions, as well as all discretionary

 6    conditions recommended by the probation office in Part D.

 7    There are sentencing options in the presentence report which

 8    are imposed to establish the basic expectations for your

 9    conduct while on supervision.

10         The mandatory conditions include:  You must not

11    commit another federal, state, or local crime.  You must not

12    unlawfully possess a controlled substance.  I have not

13    imposed the -- the mandatory drug testing.  You must

14    cooperate in the collection of DNA as directed by the

15    probation office.  You must make -- there's no restitution

16    so we don't need to do anything with that.

17         You'll also comply with the following special

18    conditions:  location restriction.  You must not knowingly

19    enter or come within 1,000 feet of a reproductive health

20    services clinic, except for a personal medical appointment,

21    without first obtaining the permission of the probation

22    office.

23         The financial obligations are immediately payable to

24    the Clerk of the Court, which at this point are the special

25    assessments.  Since I'm -- you are receiving a sentence of

1    incarceration, I'm making the finding that you cannot afford

2    a fine -- to pay a fine.  Within 30 days of any change of

3    address, you'll notify the Clerk of the Court of the change

4    until the financial obligation is paid in full.

5        The probation office shall release the presentence

6    investigation report to all appropriate agencies, which

7    includes the probation office in the approved district of

8    residence, in order to execute the sentence of the Court.

9    Treatment agencies shall return the presentence report to

10    the probation office on the defendant's completion or

11    termination from treatment.

12        In terms of the -- I wanted to double-check on this.

13    I believe that -- recommend that you receive credit for time

14    served from September 15th of 2023, and I'll ask shortly

15    about whether there's a recommendation you want me to make

16    about where to go.

17        In terms of the appeal, you have a right to appeal

18    your conviction of guilt to the U.S. Court of Appeals for

19    the D.C. Circuit.  Pursuant to 18 U.S.C. 3742(a), you have a

20    statutory right to appeal your sentence also to the

21    D.C. Circuit.  There may be certain circumstances associated

22    with it.  You also, pursuant to 28 U.S.C. § 2255, have a

23    right to challenge both the conviction and the sentence to

24    the extent it's permitted by that statute.

25        Any notice of appeal must be filed within 14 days of

1    entry of judgment or within 14 days of the filing of a

2    notice of appeal by the government.  If you can't afford the

3    cost of an appeal, you can request permission to file it

4    without cost to you.  You can also ask to have

5    court-appointed counsel.

6          The last provision before my final statement is the

7    *Hunter* case.  If there's any objections to the sentence or

8    the way it's imposed or any other issues that I need to

9    address that have not already been addressed, this is your

10   opportunity.

11         Probation?

12              THE PROBATION OFFICER:  No, Your Honor.  Thank

13   you.

14              THE COURT:  Government?

15              MS. ROSS:  Nothing else, Your Honor.  Thank you.

16              THE COURT:  Mr. Machado?

17              MR. MACHADO:  Your Honor, we would ask if the

18   Court could put a recommendation she be -- that she be

19   placed in prison as close to Boston, Massachusetts, as

20   possible.

21              THE COURT:  Okay.

22              MR. MACHADO:  Thank you.

23              THE COURT:  What I would suggest doing is that

24   there -- and you probably know this, but there is a legal

25   office.  There is also an office that, basically, makes the

1    decision about the designation.  My suggestion is that if

2    you have medical records from either the facility or from

3    Boston, you prepare them and submit them so they can look at

4    those when they're making their decision about a designation

5    and they will consider them.  They consider where you live

6    close -- placing you where you live.  That they pretty much

7    do automatically, but my suggestion -- I'll put in the

8    recommendation -- to look at the medical issues so that we

9    make sure that she's placed in a facility that can do that.

10   And there are quite a number of facilities that can.  It

11   would help probably to get the medical records too.

12            MR. MACHADO:  We appreciate that, Your Honor.

13   Thank you.

14            THE COURT:  All right.  And my final statement,

15   which I've made in each one of these cases to make it very

16   clear, Americans have been protesting in favor and against

17   abortions for the better part of a century.  There may be

18   nothing more American than such protests.  And I respect and

19   laud a commitment to peaceful protest in favor of a strong,

20   moral compass and to effect a change in the law to reflect

21   your moral values.  But that stops at the water's edge.

22            The law does not protect violent and obstructive

23   conduct, nor should it.  You crossed the line when you

24   engaged, along with your co-conspirators, in violent and

25   obstructive conduct.  And that is what you're being punished

1  for today; not your views on abortion, nor a very American
2  commitment to peaceful protest.
3      All right.  The parties are excused.  I have another
4  sentencing which I'm late for.  So I will be back in a
5  moment with my files.  Everybody take care and be well.
6      (Proceedings were concluded at 3:34 p.m.)

1                    <u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>

2

3              I, Nancy J. Meyer, Registered Diplomate Reporter,

4       Certified Realtime Reporter, do hereby certify that the

5       above and foregoing constitutes a true and accurate

6       transcript of my stenograph notes and is a full, true, and

7       complete transcript of the proceedings to the best of my

8       ability.

9

10                           Dated this 12th day of August, 2024.

11

12                           <u>/s/ *Nancy J. Meyer*</u>
                             Nancy J. Meyer
13                           Official Court Reporter
                             Registered Diplomate Reporter
14                           Certified Realtime Reporter

15

16      Proceedings recorded by mechanical stenography.  Transcript
        produced by computer-aided transcription.

17

18

19

20

21

22

23

24

25